THE STATE OF NORTH DAKOTA, Doing Business as the Bank of North Dakota, Appellant, v. DAKOTA NATIONAL BANK OF DICKINSON, NORTH DAKOTA, a Corporation, and the Middlewest Trust Company, of Valley City, North Dakota, a Corporation, Respondents.

(201 N. W. 851.)

**Banks and banking — evidence held sufficient to support that deposit was applied in discharging prior incumbrances pursuant to authority given by depositor.**

1. In an action by the State of North Dakota, doing business as the Bank of North Dakota, to recover the amount of a special deposit, made in defendant bank in connection with a farm loan transaction, it is held, for reasons stated in the opinion, that there is sufficient evidence to support a finding that the deposit was applied in discharging prior incumbrances pursuant to authority given by the plaintiff.

**Banks and banking — evidence held insufficient to support verdict on counterclaim.**

2. For reasons stated in the opinion, it is held, that the evidence is insufficient to support the verdict on the counterclaim for the difference between the special deposit and the amount of incumbrances discharged by the defendant bank.

Opinion filed December 2, 1924.    Rehearing denied December 31, 1924.

Banks and Banking, 7 C. J. § 376 p. 669 n. 39. Contracts, 13 C. J. § 517 p. 546 n. 54.

Appeal from the District Court of Stark County, *Berry, J.*

Judgment for defendant dismissing action affirmed; judgment on counterclaim reversed.

*F. E. McCurdy* and *P. H. Butler,* for appellant.

"The evidence to change a written contract by parole must be clear and convincing." Buttz v. Colton, 6 Dak. 306; J. I. Case Threshing Mach. Co. v. Loomis, 31 N. D. 27.

"Parties to an unperformed contract may by mutual consent modify it by altering, exercising or adding provision. The fact of agreement may be implied from a course of conduct in accordance with its existence. It has been held that a modified contract may be supported by a consideration consisting in the compromise or adjustment of a disputed claim—in mutual promises to perform." 13 C. J. pp. 589, 590, 592, §§ 604, 605, 608.

"Implied Rescission by Substituted Agreement.—Again, a contract need not be rescinded by an express agreement to that effect. If the parties to a contract make a new and independent agreement concerning the same matter, and the terms of the latter are so inconsistent with those of the former that they cannot stand together, the latter may be construed to discharge the former. One contract is rescinded by another between the same parties when the latter is inconsistent with, and renders impossible the performance of, the former, but if, though they differ in terms, their legal effect is the same, the second is merely a ratification of the first, and the two must be construed together." 6 R. C. L. § 307, p. 923.

*Pierce, Tenneson, Cupler & Stambaugh,* and *Crawford & Burnett,* for respondents.

"If the facts are such that different, impartial minds might fairly draw different conclusions from them, they should be submitted to the jury, and are only for the court when such that fair-minded men might draw only one conclusion from them." Carr & Erickson v. Soo R. Co. 16 N. D. 223.

"On a motion to direct a verdict for the plaintiff, the defendant is entitled to all inferences which may legitimately be drawn from the

evidence and which may be most favorable to his case." Schantz v. N. P. R. Co. 42 N. D. 377, 173 N. W. 556; La Dye v. Lebnan Twp. (Mich.) 192 N. W. 636; Goffort v. Kayser (Wis.) 192 N. W. 975; Collies v. Reliance Industry Co. (Wis.) 195 N. W. 975; Schwerin v. Anderson (Neb.) 185 N. W. 321.

"The weight and value of the testimony, as well as the credibility of the witnesses, is for the jury." Butler & Henry v. Taylor (Iowa) 192 N. W. 851.

"Where the evidence is substantial and various conflicting inferences may be drawn therefrom, the Supreme Court will not disturb the verdict of a jury." Goetz v. Zolf (Wis.) 195 N. W. 874; 4 C. J. p. 775, notes 1 and 2.

"While the burden rests upon a plaintiff to establish his case by a preponderance of the evidence, he does not fail as a matter of law merely because he is unable to sustain his claim by eye-witnesses, and, if he shows circumstances reasonably tending to establish his theory and the jury hold with him, the verdict will not be set aside because the court may think the opposing theory is the more likely to be true." First Nat. Bank v. Royal Indemnity Co. 186 N. W. 934.

"Where the evidence was in conflict, the reasonableness and probability of the testimony of different witnesses and the credibility of the witness was for the jury." Riniker v. Newkirk (Iowa) 179 N. W. 825; Hopper v. Bowling (Iowa) 181 N. W. 759; Vinton v. Plainfield (Mich.) 175 N. W. 403.

"A jury may disbelieve the most positive evidence even when it stands uncontradicted and the judge cannot take from them their right of judgment." Retter v. Detroit United R. Co. (Mich.) 171 N. W. 514.

"The construction of the language used by a witness in giving testimony is a matter for the jury." Goldstein v. Northern Pacific, 37 N. D. 608, L.R.A.1918A, 612, 164 N. W. 143.

That it is for the jury to determine what are the terms of an oral agreement, see also Heimberger v. Rudd (S. D.) 138 N. W. 374.

"An obligation is extinguished by an offer of performance made in conformity to the rules herein prescribed and with intent to extinguish the obligation." Comp. Laws 1913, § 5800; Swallow v. First State

Bank (N. D.) 161 N. W. 207; Foster Implement Co. v. Smith, 17 N. D. 178.

"Novation is the substitution of a new obligation for an existing one." Comp. Laws 1913, § 5829.

"Whether the agreement of January 1921, was intended by the parties as a substitution for the previous agreement is a question of fact for the jury." Lemon v. Little (S. D.) 114 N. W. 1003.

"It is not necessary that there be an express agreement of modification or substitution; a new agreement may be implied from the conduct of the parties." Powers v. Rutland R. Co. 92 Atl. 463, cited in 13 C. J. 591, note 9.

"A failure to perform the new contract does not revoke the old." 13 C. J. 595 to 596.

"The consideration of a modification of an executory contract may rest in the mutual assent of the parties to the new agreement, in the substitution of the new contract for the old, in mutual promises to perform, or in the performance of the new contract." 13 C. J. 593, notes 34 to 37.

JOHNSON, J. The plaintiff brought action against the defendants to recover $14,000.00 alleged to have been left, with the defendant bank, hereinafter referred to as the bank, as a special deposit on May 3, 1920. The complaint alleges the making of the deposit as aforesaid; the refusal of the bank, on the 20th of January, 1922, on demand to repay the deposit to the plaintiff with interest; the execution by the defendant trust company of a surety bond; the giving of notice to the surety company of the failure of the defendant bank to repay the deposit and of an agreement and understanding when the deposit was made that the same should bear interest at 6% a reasonable time after the date of deposit; and that interest was demanded from and after May 20, 1920. The surety bond is made a part of the complaint. To this complaint the defendants answered separately. The bank admits that a special deposit of $14,000 was made by the plaintiff in connection with a real estate loan granted to one Wokal; that the plaintiff procured from Wokal a note in the sum of $14,000.00 and a mortgage upon certain real property securing the same; that for the purpose of completing the loan and in connection therewith, the plaintiff author-

ized the defendant to discharge prior liens and incumbrances upon the premises from the special deposit aforesaid, to the end that the plaintiff's mortgage would be a first lien. The bank then alleges that it required all of the $14,000.00 in the special deposit to discharge the incumbrances and that, in addition, the bank advanced $774.76 to satisfy prior liens. This defendant avers further that the plaintiff owns and holds the note and the mortgage securing the same; that the bank has no money on deposit belonging to the plaintiff; and that the plaintiff authorized the defendant to disburse the money thus deposited for the purposes stated. It is then alleged that the plaintiff is estopped from denying the transaction or setting aside the loan to the said Wokal thus consummated. The bank alleges a counterclaim based on alleged advances in order to discharge prior incumbrances in behalf of plaintiff and Wokal; that the plaintiff "was to take a chattel mortgage upon the crops of said Joseph Wokal in payment therefor and said money was duly paid out for and on behalf of said plaintiff in completion of the loan."

The defendant Trust Company, answering separately, denies liability under the bond and alleges that the special deposit made with its codefendant was not a deposit within the conditions of the bond; that at the time of the alleged demand upon the bank for the return and repayment of the special deposit, all of it had been disbursed for and in behalf of and pursuant to authority given by the plaintiff.

The case was tried to a jury and resulted in a verdict for the defendant bank upon its counterclaim in the sum of $590.13, upon which verdict judgment was duly entered. The jury likewise found in favor of the Trust Company. The plaintiff, in due time, asked for judgment notwithstanding the verdict and also made a motion for a new trial. Both motions were denied. The appeal is from the judgment and from the orders denying the motions for judgment notwithstanding the verdict and for a new trial. The motion for a new trial was made generally upon the grounds that the evidence was insufficient to justify the verdict; of errors of law occurring at the trial; of excessive damages given by the jury under the influence of prejudice and passion.

There are eight specifications of error. The case turns on the sufficiency of the evidence to justify certain instructions and to support

the verdict dismissing plaintiff's case and finding for the bank on the counterclaim.

The court instructed the jury fully upon every aspect of the case. The court told the jury that if they found that a deposit of $14,000.00 was made with the defendant bank and that a letter of instructions accompanied the deposit, that then the letter of instructions would constitute the agreement between the plaintiff and the defendant bank with reference to the deposit; that if there was any change in the agreement, the burden was upon the defendant to prove such change by a fair preponderance of the evidence and that if the defendant failed in this regard a verdict should be returned for the plaintiff for the full amount, provided the instructions in the letter accompanying the deposit were not followed. It is not necessary at this point to review or summarize the instructions further. They are very full. The case was tried and submitted on the theory that the instructions contained in the two letters accompanying the deposit were departed from by mutual agreement and that the bank was authorized by the plaintiff to discharge certain incumbrances against the property on the security of which the plaintiff was making a loan to Wokal, and that, pursuant to such authorization, the bank exhausted the deposit, and, in addition, advanced funds of its own for the purpose of clearing the record of incumbrances that would constitute liens prior to that of the plaintiff. It is upon such additional advances that the counterclaim is based.

Wokal, the borrower, in writing, and upon a form prepared by the plaintiff, on October 2, 1919, appointed the bank his agent "to prepare the application for loan; to superintend the completion of loan papers; to pay off and discharge existing mortgages, liens or taxes of record; to obtain an abstract of title; to pay fees; to receive moneys due the undersigned; to transmit papers or funds to The Bank of North Dakota, and generally to do all things necessary towards clearing up the title and making the mortgage to The Bank of North Dakota a first mortgage, and to attend to the collection and payment of the annual installments under the mortgage, in consideration of which the undersigned agrees to pay to the said bank a fee of $5.00 for the completion of the loan and a fee of one-fourth of one per cent annually on the unpaid principal during the life of the loan."

On May 3, 1920, the plaintiff wrote the defendant bank a letter and enclosed therewith a cashier's check in the amount of $14,000.00 "as a special deposit during the reasonable time required to discharge the liens and, upon completion of the loan and acceptance of the same by the Bank of North Dakota, the said deposit will be turned over to you by means of our check drawn upon you against this special deposit." This is the letter of instruction to which frequent reference is made throughout the record. There was enclosed with this letter a note and mortgage to be executed by the borrower, "our mortgage to be a first lien upon the land, subject to the approval of our title examiner." The letter then says that if it appears that the mortgage can not be made a first lien, the papers should be returned and the plaintiff notified accordingly. Defendant is informed that the note must bear the proper amount of revenue stamps; that the mortgage must be recorded and shown on the abstract; and that the abstractor's certificate in the form enclosed must be attached. It is also required that tornado and fire insurance in the amount of $1500.00, with full contribution clause, be procured. On May 3, the plaintiff wrote another letter to defendant as follows:

"Owing to the necessity for haste in the matter, contrary to our usual procedure, we have prepared Mr. Wokal's mortgage and note and forward to you for execution and filing prior to receipt of an abstract. Kindly file the mortgage at once and forward to us an abstract for examination, which we will return to you in a day or two for continuation, showing thereon our mortgage and satisfaction of prior incumbrances."

It appears that a mortgage upon the property had been foreclosed and that the time for redemption was about to expire. This fact explains the reference in the second letter of May 3 to the necessity for haste in closing the loan. On May 15, 1920, the defendant bank notified the plaintiff by letter that the abstract could not be furnished, owing to a delay in the abstract office at Manning, the county seat of the county where the real property was situated. In this letter the bank gave the plaintiff a general statement as to prior incumbrances upon the property. The letter continues:

"As Monday is the last day to redeem we wish you would call us

up at our expense upon receipt of this letter and advise us whether or not we should make the redemption from the foreclosure."

Plaintiff is then advised that the original mortgage has been recorded and is in the possession of the bank. On May 16, the bank again wrote, advising that the abstract had been received and that the same was being forwarded to plaintiff. The letter concludes: "If possible, call us before noon to-morrow and advise whether or not to make the redemption." This letter was written on Sunday. The following Monday, the 17th, was the last day on which redemption could be made. Mr. Baird, at that time the president of the bank, testified that he was called on the telephone by the plaintiff, that he talked with one McIntosh, in charge of the farm loan department; that he asked them what he should do and that "they replied to go ahead and make the redemption." The witness testifies that he said: "Will I make the redemption for you?" and that, over the telephone, the department told him to "make the redemption." It seems that nothing was expressly said with reference to the use of the special deposit for this purpose. Thereupon the bank redeemed and paid in that connection $2523.66. On May 16, plaintiff returned the abstract to defendant bank for correction, calling attention to various liens and incumbrances outstanding and other features of the title. The letter concludes with this paragraph:

"Regarding the matter the writer spoke of this morning over the 'phone: Mr. McIntosh tells me that the arrangements for the separate note and chattel mortgage were to be taken care of by Mr. Wokal and the gentleman who was here with him, and was to be executed and sent to this bank."

This refers to the contemplated method of taking up the excess of incumbrances over the amount of the loan as allowed, to-wit, $14,-000.00. The next letter in the record in connection with the completion of the loan transaction is dated September 7, 1920, written by the bank to the plaintiff. This letter shows that the bank had had the abstract at the abstract office for correction twice and that upon checking up all of the items that it would require about $1200.00 to remove prior liens upon the land. In this letter it is said:

"The objection you stated of in your letter has been partly reme-

died, but as I have already stated the $14,000.00 is not enough to pay off all liens prior to your mortgage. We shall endeavor to get in touch with Wokal and find out whether or not he will be able to raise this extra money to clean the matter up and advise you as soon as we know definitely what is to be done."

At this date it appears that the bank did not expect to advance the excess; nor did it anticipate that the plaintiff would do so. On November 16, 1920, the plaintiff drew a draft on the bank in the sum of $14,000.00, stating that the special deposit was being withdrawn and that, in substance, the loan could not be made. Prior to this date and on September 10, the plaintiff apparently had written the defendant that unless Wokal could procure the additional funds to clear all existing incumbrances within ten days the special deposit "which was advanced in connection with this loan" would be withdrawn. On November 17, the bank wrote plaintiff that it had refused payment of the draft "for the reason that this fund shows an amount of $11,476.34, and if we had paid your draft the account would have been overdrawn to the amount of $2523.66. We shall be pleased to honor your draft in the amount of $11,476.34." On November 20, plaintiff's attorney, one W. A. Anderson, notified the defendant Trust Company that the principal in the bond had defaulted in refusing to pay the special deposit of $14,000.00. On December 1, the bank wrote a letter to the plaintiff, enclosing therewith a draft in the sum of $11,476.34, which was the balance of the $14,000.00, after deducting the amount used in redeeming from the foreclosure sale on May 17, 1920. This tender was refused by the plaintiff. On December 11, plaintiff's attorney Anderson again wrote the bank, suggesting a conference. A meeting was accordingly had in the Bank of North Dakota on or about the 2nd of January, 1921. At that conference the witness Baird says that the conversation was in effect "that we were to go ahead and expend the rest of the money that was left in the special deposit, and *we were to put up the difference or get the other liens released as best we could.*" On the 24th of February, following, defendant wrote plaintiff that the loan had been completed so as to show the mortgage of $14,000.00 a first lien on the premises, but that the papers could not all be forwarded at that time. On the 25th of February the defendant asked for additional time because a seed lien had been discovered which it was

necessary to remove. This extension was granted. Then some correspondence was had pertaining to the seed lien, extending into the summer and fall of 1921. Negotiations with the commissioners of Dunn County to remove the seed lien were conducted and finally the bank succeeded in effecting a release of that lien by giving a bond so that the mortgage to the plaintiff became a first lien on the property. The bank was assisted in the negotiations actively by one Painter, title examiner for the plaintiff, who conferred with at least some of the commissioners of Dunn County. The testimony tends to show that in August, 1921, the condition of the title was satisfactory to the plaintiff but for the seed lien. It further shows that on January 25, 1921, the defendant drew a draft in favor of the holder of a prior mortgage in the sum of $12,217.47, which draft was duly paid. The testimony is that no objection was made to the title after the first and second mortgages had been paid, as heretofore indicated, with the exception of the seed lien and that was removed by the bank.

In November, 1921, there was a change in the management of the Bank of North Dakota. The new management, upon examining the record with respect to this Wokal loan, seemingly came to the conclusion that the loan was not desirable and commenced negotiations with the bank to cancel the application and to withdraw the special deposit. On January 12, 1921, the bank wrote the plaintiff, explaining the delay, informing the plaintiff that the bank had prepared a bond on the 5th of January, guaranteeing to Dunn County the payment of the amount of the seed lien and advising plaintiff further that as soon as the matter was duly certified by the auditor of Dunn County the seed lien would be released. The bond to Dunn County is in the record. Entry No. 108 on the abstract shows that the seed lien was satisfied January 13, 1922. On January 13, the plaintiff wrote the bank that the loan could not be accepted "because of unreasonable delay in the closing thereof" and also advising the defendant that a draft would be drawn, on January 20, 1922, for the amount of the special deposit. On January 18, 1922, the bank wrote plaintiff, enclosing abstract of title, showing the mortgage to the plaintiff bank a first mortgage upon the property, and also showing that the seed lien had been released. It is stated in the letter that the 1918 and 1919 taxes are unpaid, but that the bank or Wokal will pay the taxes; and that the tax receipts

will be sent to the plaintiff. On the 18th of January, the plaintiff returned the papers to the bank. The plaintiff drew a draft accordingly on the bank, which was presented and payment refused. Thereafter this suit was commenced.

From the record it appears that the title had been cleared pursuant to instructions so that the plaintiff had a first mortgage upon the premises and that this had been accomplished fully on the 13th day of January, 1922; it further appears from the testimony of the witness Baird that the bank was, on May 17, 1920, directed to make redemption for the plaintiff; that thereafter and on or about the 2nd of January, 1921, after a controversy had arisen, the defendant was authorized to discharge another mortgage out of the special deposit over which the controversy had arisen; that thereafter that lien was accordingly discharged; and that the bank cleared the record of all prior mortgages, with the result that the plaintiff had a first mortgage upon the premises securing the loan of $14,000.00. There is dispute as to the telephone conversation of May 17, 1920, and as to what took place at the conference on the 2nd of January, 1921.

It is not the province of this court to weigh the evidence. The jury are the triers of the facts; they heard the testimony and saw the witnesses; they found upon all the issues for the defendant bank.

We think that the record fairly supports a finding that the plaintiff, with full knowledge that the defendant bank was the agent of the borrower for the purpose of completing the loan, authorized the Dakota National Bank to use the so called special deposit to discharge the liens of two prior mortgages thereon, making the Wokal mortgage of itself a prior lien; and that, pursuant to such authority, a redemption was made in one instance and a mortgage lien discharged in another, exhausting such deposit. This is disputed, but we think the verdict of the jury on this issue has substantial support in the evidence.

The defendant bank interposed a counterclaim. The theory of the counterclaim was that the defendant bank had advanced money at the request and on the credit of the plaintiff to pay outstanding incumbrances in excess of the special deposit of $14,000.00, which was the amount in which the Wokal loan was approved and allowed. The plaintiff contends that any arrangement on the part of the bank with Wokal to advance him money upon the security of a crop mortgage, in

excess of the amount of $14,000.00, which was to be secured by a mortgage upon the land, was in violation of chapter 147, Sess. Laws 1919, creating the Bank of North Dakota, and that any evidence thereon was wholly inadmissible. Section 15 of that chapter defines the powers of the bank, with reference to the loaning of funds under its custody and control. "It may make loans to counties, cities or political sub-divisions of the state, or to state or national banks on such terms, and under such rules and regulations, as the Industrial Commission may determine; but it shall not make loans or give its credit to any individual, association or private corporation, except that it may make loans to any individual, association or private corporation secured by duly recorded first mortgages on real estate in the State of North Dakota in amounts not to exceed one-half the value of the security, or secured by warehouse receipts issued by the Industrial Commission or by any licensed warehouse within the state in amounts not to exceed 90% of the value of the commodities evidenced thereby." It will be noted that the act distinctly prohibits loans to individuals except upon the two classes of security enumerated in the act, that is, real estate and warehouse receipts. The inference from the correspondence is entirely legitimate and Wokal expressly so testifies, that some officers of the bank, notwithstanding the provisions of the statute, intended, at one time, to loan Wokal upon a crop mortgage an amount sufficient to pay all liens in excess of $14,000.00. His application for a loan was first allowed in the sum of $12,000.00; later, it was increased to $14,-000.00; that was not sufficient to take up all outstanding incumbrances and the testimony shows that thereupon the Bank of North Dakota agreed to loan money to Wokal upon a crop mortgage; for this there was no authority in the act creating the Bank of North Dakota; in fact, such a loan is expressly prohibited by section 15. This intent, however, existed prior to May 17, 1920. When the parties conferred on January 2, 1921, there was no reference to this method of making up the excess; Wokal was not then on the land. Conditions had changed. The arrangement then made did not contemplate an illegal loan to Wokal in any amount. The understanding was different, as will shortly appear.

The defendant bank paid on prior mortgages, exclusive of other liens, seed liens or taxes, $14,741.13—$741.13 in excess of the special

deposit. The bank bases its counterclaim upon this excess payment, as well as other items. The verdict of the jury was for $590.13. When the first payment was made in the sum of $2523.66 on May 17, 1920, it was made, according to the testimony of the defendant's witnesses, pursuant to instructions from the Bank of North Dakota to make redemption *for* plaintiff; when the second payment in discharge of a prior mortgage was made, on January 25, 1921, in the sum of $12,217.47, it was made, according to the testimony of the defendant's witnesses, out of the special deposit and pursuant to authority from the plaintiff. Although this payment not only exhausted, but exceeded, the amount of the special deposit, the bank made no claim for the excess against plaintiff until after this action was commenced. Indeed, one of defendant's witnesses says that the difference was charged to expense. At the time of the conference in January, 1921, all the parties knew that the special deposit would not be sufficient to discharge the incumbrance of $12,217.47. Notwithstanding, it seems to have been understood that the bank would pay the mortgage in full. For whom did the bank advance the excess? For the plaintiff, the bank contends; for the bank, or Wokal, says the plaintiff. On this question the plaintiff's witnesses testify, in substance, that the plaintiff would loan no more than $14,000.00 and that the bank agreed to take care of the difference.

The testimony of Mr. Baird, the only witness for the defendant bank, as to the conversation that took place on the 2d or 3rd of January, 1921, in the offices of the Bank of North Dakota, with reference to the matters in controversy between the parties, insofar as material upon the issues of the counterclaim is as follows: Direct Examination: "Q. In this conversation was any authority given you to draw on this special deposit to complete the satisfaction of the liens on the land? A. I don't know just what the conversation was, but in effect it was that we were to go ahead and expend the rest of the money that was left in the special deposit, and *we were to put up the difference* or get the other liens released as best we could." Cross Examination: "Q. At that conference it was agreed between all of the parties that this matter (the Wokal loan) should go thru as originally planned? A. I think that is right. Q. And that the Dakota National Bank was to go ahead and finish up clearing up this title and if it took more than

$14,000.00 the Dakota National Bank was going to take care of it in some manner? A. Yes, or rather, Mr. Wokal was going to get some of it. Q. At any rate it was agreed that it was up to the Dakota National Bank to furnish the Bank of North Dakota with an abstract showing their mortgage to be a first lien? A. I don't know as I will agree exactly with what you say, but substantially the Dakota National Bank undertook to do that. Q. Was there any other verbal agreement than that? A. I don't know as there was, but anyhow we had lots of conversation."

The foregoing is all the testimony in behalf of defendant bearing upon the question as to whether the difference between the amount of the special deposit and the amount of the incumbrances, advanced by the bank, was, under the agreement of the parties, to be repaid the bank by the plaintiff. The testimony of the plaintiff's witnesses is to the effect that the title was to be cleared and that $14,000.00 was all that the Bank of North Dakota would loan Wokal, directly or indirectly.

We do not believe that this evidence is sufficient to support the verdict of the jury on the counterclaim. The jury must necessarily have found that the difference between the $14,000.00 and the amount of the incumbrances was advanced in behalf of and at the request of the plaintiff. The testimony of the witness Baird does not support such a finding. On the contrary, it indicates that the bank and Wokal were to make up the difference. Baird testifies that the parties had no agreement on the controverted question of whether the defendant bank was acting as agent for Wokal or for the plaintiff; neither was there any agreement on the question as to whether the parties were to proceed under the original letter of instructions, or otherwise, except that the bank was authorized to exhaust the special deposit to discharge incumbrances. It was agreed that the loan be completed and that a reasonable time be given Wokal and the bank to clear the record. Later that was done and a clear title, showing the plaintiff's mortgage a first lien, was presented. Baird testified for the defendant that the only objection, as late as August, 1921, which the Bank of North Dakota had, was the seed lien. He was asked: "And at that time (Aug. 1921) was the loan satisfactory provided this seed lien could be adjusted in some way so as to make their mortgage a prior mortgage on

the land? A. Yes, as far as I know, it was not questioned any more." That was more than six months after the special deposit had been exhausted in paying prior incumbrances and up to that time, at least, no claim had been made by the bank against the plaintiff for reimbursement on account of advances made beyond the amount of the special deposit. The practical construction of the understanding of January 2, 1921, by the parties themselves is entitled to some weight, now that a controversy has arisen as to its import. See 13 C. J. 546.

The judgment dismissing plaintiff's action is affirmed; the judgment for defendant on the counterclaim is reversed and the counterclaim dismissed.

BRONSON, Ch. J., and BIRDZELL, CHRISTIANSON, and NUESSLE, JJ., concur.